**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
ROBERT G. WRIGHT, JR.          )
                               )
          Plaintiff,           )
                               )
     v.                        )
                               )
FEDERAL BUREAU OF              )
INVESTIGATION,                 )     Civil Action No. 02-915 (GK)
                               )
                               )
          Defendant.           )
_____)


_____
JOHN VINCENT,                  )
                               )
          Plaintiff,           )
                               )
     v.                        )
                               )
FEDERAL BUREAU OF              )
INVESTIGATION, et al.,         )     Civil Action No. 03-226 (GK)
                               )
                               )
          Defendants.          )
_____)
```

<u>**MEMORANDUM OPINION**</u>

Plaintiffs are Robert G. Wright, Jr., a FBI Special Agent based in Chicago, and John Vincent, a retired FBI Special Agent, who were both members of the FBI's Counter-Terrorism Task Force. Plaintiffs were denied permission, pursuant to the FBI's prepublication review policy, to publish certain writings critical of the FBI's counter-terrorism efforts. They bring these separate lawsuits against the Defendant, Federal Bureau of Investigation ("FBI"). Vincent has also named the Department of Justice as a

Defendant.[1]   Both Plaintiffs allege the same causes of action: that Defendants violated the First Amendment (Count I), 28 C.F.R. § 17.18 (the FBI's prepublication review regulation) (Count II), and the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (B), and (D) (Count III).   Plaintiffs both seek:   1) a declaratory judgment that Defendants' refusal to grant them permission to publish their writings was unlawful; 2) an injunction prohibiting Defendants from continuing to refuse them permission to publish their writings; and 3) attorneys' fees and costs.

This matter is before the Court on Defendants' Motions for Summary Judgment and Plaintiffs' Cross Motions for Summary Judgment in both cases.[2]   Upon consideration of the Motions, Oppositions, Replies, and the entire record herein, and for the reasons stated below, Plaintiffs' Motions are **denied**, and Defendants' Motions are **denied** with respect to Plaintiffs' First Amendment Claims, and **granted** with respect to Plaintiffs' claims under 28 C.F.R. § 17.18 and the APA.

---

[1]   The Court uses the term "Defendants" throughout this Opinion to refer to the FBI and the DOJ.   Where only Plaintiff Wright's submissions are concerned, however, the term should be read to include only the FBI.

[2]   Although these cases have not been consolidated, the Court has addressed the Cross Motions for Summary Judgment in both cases in this single Memorandum Opinion because almost all the legal issues overlap and many of the facts overlap.

## I. BACKGROUND[3]

Upon joining the FBI, Plaintiffs signed an agreement requiring them to seek prepublication review from the Office of Public and Congressional Affairs ("OPCA") of certain information before disclosing it publicly.  The agreement states:

> as consideration for employment, I agree that I will never divulge, publish, or reveal . . . to any unauthorized recipient without official written authorization by the Director of the FBI or his delegate, any information from the investigatory files of the FBI or any information relating to material contained in the files, or disclose any information or produce any material acquired as a part of the performance of my official duties or because of my official status . . . I agree to request approval of the Director of the FBI in each such instance by presenting the full text of my proposed disclosure in writing . . . at least thirty (30) days prior to disclosure.   I understand that this agreement is not intended to apply to information which has been placed in the public domain . . . .

Defs.' Vincent Mot. Summ. J., Ex. 3.

In furtherance of this employment agreement, the FBI developed its prepublication review policy, which is mandatory for all current and former FBI employees.  Its purpose is to "identify information obtained during the course of an individual employee's employment/work with the FBI, the disclosure of which could harm national security, violate federal law, or interfere with the law

---

[3]   Summary judgment may be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). Consequently, unless otherwise noted, the Court states only uncontroverted facts.

enforcement functions of the FBI." Defs.' Vincent Mot., Ex. 1, Bolthouse Decl. ¶ 8.

The FBI's prepublication review policy and procedures are set forth in the FBI's Manual of Administrative Operations and Procedures ("MAOP") Part I, Sections 1-24. See id., Ex. 18. Pursuant to the policy, an employee or former employee who wishes to disclose information obtained during the course of his or her employment with the FBI, must first obtain the Bureau's permission. To do so, the individual must submit to the FBI the information he or she wishes to disclose in written format prior to disclosing it.

The FBI "endeavors to complete the prepublication review process within 30 business days from the date of receipt although additional time may be required depending upon the complexity of the submission." Id., Ex. 1, Bolthouse Decl. ¶ 9; see also id., Ex. 18, MAOP Part 1, Section 1-24(4)(a)(1) ("The Bureau will endeavor to review the material in a timely manner but disclosure is not authorized until the review is complete."); id. at 4(a)(2)(b) (OPCA will "prepare the FBI response to each request for prepublication review not later than 30 workdays after the request and all related materials are received by the FBI").

At the time Plaintiffs submitted their writings, the prepublication review process utilized a panel comprised of one member from each of the FBI's five divisions. Each panel member would read the submissions and, through either group meetings or

4

individual reports, identify matters which he or she thought could not be published.   The MAOP requires that the panel "either authorize disclosure in full or provide written objections to specific portions (by page and paragraph number) specifying why the FBI should withhold permission to disclose," id. at 4(a)(3)(d), and that "[i]f a panel objects to disclosure of any portion of a work, OPCA shall notify the requester that the FBI withholds permission to disclose or publish the portions to which the board has objected and request such modifications as may be necessary," id. at 4(a)(4).

The prepublication review policy provides that the FBI may request the assistance of "personnel from other agencies or entities if the work contains or relates to matters under the cognizance of or involves the expertise of such agencies or entities."   Id. at 4(a)(3)(c).

Pursuant to the prepublication review policy, Wright sought permission to publish: 1) his answers from an interview with New York Times reporter Judith Miller; 2) his five-hundred page manuscript ("Fatal Betrayals manuscript") about an investigation ("Vulgar Betrayal investigation") into known terrorist threats against United States national security and the FBI's efforts to thwart that investigation; 3) a 38 page complaint filed with the DOJ, Office of Inspector General ("OIG"), titled "Dereliction of Duty by the Federal Bureau of Investigation in Failing to

Investigate and Prosecute Terrorism and Obstruction of Justice in Retaliating Against Special Agent Robert G. Wright, Jr."; and 4) a 113 page complaint to be filed with the DOJ, OIG, titled "Whistleblowing Retaliation by the Federal Bureau of Investigation against Special Agent Robert G. Wright, Jr." (referred to together herein as OIG complaints).  Vincent sought permission to publish only his answers from his interview with Judith Miller.

Plaintiffs both worked on the Vulgar Betrayal investigation, which uncovered a money laundering scheme in which United States-based members of the HAMAS terrorist organization were using non-profit organizations to recruit and train terrorists and fund terrorist activities in the United States and abroad.  Wright Decl. ¶ 3.  The Vulgar Betrayal investigation ultimately resulted in the FBI's seizure of $1.4 million in funds which were targeted for terrorist activities.[4]  The seized funds were linked directly to Saudi businessman Yassin Kadi, who was later designated by the Government as a financial supporter of Osama Bin Laden. Plaintiffs' submissions were highly critical of the FBI's handling of the Vulgar Betrayal investigation and other FBI operations prior to September 11, 2001.[5]

---

[4]  Defendants agree that the Vulgar Betrayal investigation was shut down in 1999 and officially closed in August 2000.  Defs.' Vincent Mot., Ex. 5.

[5]  Wright completed his manuscript days after the September 11 attacks.

6

Wright submitted his Fatal Betrayals manuscript for prepublication review in the beginning of October 2001.[6]   In the beginning of January 2002, the FBI informed him that about 18% of the manuscript would require modifications because it contained "classified information; information containing sensitive investigative material and information protected by the Privacy Act."  Defs.' Wright Mot., Ex. 1, Bolthouse Decl. at ¶ 5(d).   In accordance with the FBI's suggestions, Wright edited and re-submitted his materials, with the 18% either deleted or modified to address the Government's concerns.  In support of his revisions, Wright submitted three binders full of endnotes, which he alleges provided a public source of information for each of the passages to which Defendants had objected.[7]

On November 13, 2001, Wright submitted his OIG complaints to the OPCA for prepublication review.  On January 7, 2002, the OPCA responded, taking issue with only 4% of the first document and 6% of the second.  Again, on January 18, 2002, Wright re-submitted the documents with deletions and edits.

In March 2002, New York Times reporter Judith Miller submitted to Wright a series of written questions concerning his allegations

---

[6]   Wright resubmitted his manuscript in November 2001, after being informed that delivery of the first copy was delayed by disruptions in mail flow due to anthrax incidents.

[7]   These endnotes have not been filed with the Court and therefore are not part of the record of this case.

about the FBI's mishandling of the Vulgar Betrayal investigation. She gave Vincent a similar series of questions.   Miller also interviewed FBI officials, including Wright's supervisor, about Wright's charges against the agency in March of 2002.  On March 31, 2002, both Wright and Vincent submitted to the OPCA their proposed answers to Miller's questions for prepublication review.

On May 10, 2002, the day after Wright filed suit in this Court, the FBI responded separately to Wright and Vincent regarding all of their submissions.  The FBI indicated to both of them that, as a result of its review and guidance from the U.S. Attorney's Office for the Northern District of Illinois,[8] their submissions all contained information regarding open investigations, matters occurring before a grand jury, and information relating to law enforcement techniques and other sensitive information.  According to the FBI, the protected information was so intertwined with other material in the submissions, that they could not be amended or segregated so as to be suitable for publication.[9]   The FBI

_____

[8]   At some point, the FBI consulted with the United States Attorney's Office for the Northern District of Illinois ("USAO N.D.Ill.") because that office had "participated in the investigation(s), possessed a detailed knowledge of the investigation(s), and had an interest in the success of the investigation(s)."   Defs.' Vincent Mot. at 18.   The FBI also consulted with the US Attorney's Office for the Eastern District of Wisconsin.   Both offices informed the FBI that Plaintiffs' submissions were not suitable for publication.

[9]   The FBI did not provide more specific objections by line and paragraph number.

therefore reversed its prior position and denied Wright permission to publish _any_ of the materials he submitted, and issued a blanket denial as to Vincent's interview answers submission.

In early June 2002, both Wright and Vincent appealed these decisions to the FBI Director, Robert Mueller, and their appeals were denied.

On November 7, 2002, and January 6, 2003, respectively, Plaintiffs Wright and Vincent appealed to the Office of the Deputy Attorney General pursuant to 28 C.F.R. § 17.18(i).  On December 19, 2002, and January 17, 2003, respectively, Deputy Attorney General David Margolis responded, indicating that an appeal to his office, which handled appeals of FBI decisions prohibiting disclosure of classified information, was inappropriate because "no classified information" was contained in Plaintiffs' submissions.

Approximately 15 months later, the FBI changed its position yet again.  On October 31, 2003, more than two years after Wright first submitted the Fatal Betrayals manuscript for prepublication review, the FBI sent him a letter explaining that "following a request from a Congressional committee for the [manuscript] another review had been conducted . . . and that it had been determined that Chapters 1-4 (inclusive)" and parts of Chapter 7 could be published.  Def.'s Wright Mot. at 8.  The FBI still prohibited publication of Chapters 5-6 and 8 through 27.

On December 22, 2003, approximately one year and seven months after its blanket denial of Vincent's request, the FBI sent him a letter stating that the answers to many of the interview questions previously submitted (2-6; 8-9; 11-14; 16; 18-19; and 21) could be disclosed in their entirety, and that the answers to questions 15 and 17 could be disclosed in part.  On May 4, 2004, the FBI granted Vincent permission to publish the response to interview question 15 in full.   The FBI continued to prohibit publication of 5 of Vincent's interview answers.

On February 5, 2004, the FBI sent Wright a letter advising him that it had conducted a re-review of his answers to Judith Miller's interview questions and had determined that answers 2-6, 8, 11-13, 15-16, 18-19, 21, 25-26 and parts of 1, 9, and 14 could be published.  Id. at 9.

Finally, on March 25, 2004, the FBI sent Wright a letter stating that his OIG complaints could be submitted to the DOJ, OIG without the need for prepublication review, but that release to any other party was prohibited.[10]

## II. STANDARD OF REVIEW

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits or declarations, show that there is no

---

[10]  Wright's OIG complaints had already been submitted to the OIG in 2001.  See Wright Decl. at ¶ 43.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56. Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Id. at 324 (internal quotations omitted).  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (nonmoving party has affirmative duty "to provide evidence that would permit a reasonable jury to find" in its favor); Crenshaw v. Georgetown Univ., 23 F.Supp.2d 11, 15 (D.D.C. 1998) (noting that "adverse party must do more than simply 'show that there is some metaphysical doubt as to the material facts'" (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150

(2000).  Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

In McGehee v. Casey, the D.C. Circuit articulated a standard for judicial review of individual censorship decisions by the CIA pursuant to a secrecy agreement.[11]  The court stated:

> While we believe courts in securing such determinations should defer to [agency] judgment as to the harmful results of publication, they must nevertheless satisfy themselves from the record, in camera or otherwise, that the [agency] in fact had good reason to classify, and therefore censor, the materials at issue.  Accordingly, the courts should require that [agency] explanations justify censorship with reasonable specificity, demonstrating a logical connection between the deleted information and the reasons for classification.  These should not rely on a 'presumption of regularity' if such rational explanations are missing.  We anticipate that in camera review of affidavits, followed if necessary by further judicial inquiry, will be the norm.[12]

718 F.2d 1137, 1148-49 (D.C. Cir. 1983).  Furthermore, "[c]ourts should . . . strive to benefit from 'criticism and illumination by

---

[11]    Although in McGehee, the court was addressing a prepublication review scheme which applied only to classified information, the standard articulated is useful in this case because it attempts to balance the interests of an intelligence agency in maintaining secrecy and protection of national security information and an individual's First Amendment rights.

[12]    The Government submitted for in camera review the Plaintiffs' actual submissions along with a letter from Joan Bainbridge Safford to the OPCA and a letter from Assistant U.S. Attorney Joseph Ferguson to the FBI.  The letters provide some of the reasoning underlying the FBI's decision to censor parts of Plaintiffs' submissions.

the party with the actual interest in forcing disclosure.'" Id. at 1149 (internal citations omitted).

## III.  ANALYSIS

### A.    Genuine Issues of Material Fact Preclude Entry of Summary Judgment in Either Party's Favor on Plaintiffs' First Amendment Claims

In this case, Plaintiffs are only making a First Amendment challenge to Defendants' decisions denying them permission to publish various materials they submitted for prepublication review; they are not making a facial challenge to the constitutionality of the FBI's entire prepublication review process.  Therefore, this Court must conduct a narrow, fact-based inquiry into whether the FBI violated Plaintiffs' First Amendment rights in handling their requests and ultimately denying them permission to publish portions of their submissions.

### 1.    The Pickering Balancing Test[13]

The Supreme Court has long recognized that expression about public issues rests "on the highest rung of the hierarchy of First Amendment values." Carey v. Brown, 447 U.S. 455, 467 (1980). The constitutional protection for freedom of expression on public

---

[13]    A recently decided Supreme Court case, Garcetti v. Ceballos, 126 S. Ct. 1951, 1955 (2006), dealt with "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties." Garcetti does not apply to the case at bar because neither Vincent's nor Wright's submissions were written as part of their official duties as FBI Special Agents.

matters, which was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," Roth v. United States, 354 U.S. 476, 484 (1957), is at the very core of our constitutional and democratic system. Stromberg v. People of State of Cal., 283 U.S. 359, 369 (1931). Therefore, in addressing challenges under the First Amendment, courts must keep in mind that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) (citing Terminiello v. Chicago, 337 U.S. 1, 4 (1949); De Jonge v. Oregon, 299 U.S. 353, 365 (1937)).

The Supreme Court has also recognized, however, that the speech of public employees on matters of public concern may be restrained in ways that, if imposed on the general public at large, would violate the Constitution. Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); United States v. NTEU, 513 U.S. 454, 115 S. Ct. 1003, 1012 (1995); see also Snepp v. United States, 444 U.S. 507, 510 n.3 (1980). As our Circuit has noted, this principle "impl[ies] a substantially voluntary assumption of special burdens in exchange for special opportunities, as well as the complex and subtle interests peculiar to any employer's needs in making effective use of its workforce . . . ." Weaver v. United States

14

Info. Agency, 87 F.3d 1429, 1440 (D.C. Cir. 1996) (cert denied, 117 S Ct. 2407 (June 2, 1997)).

In Pickering, the Supreme Court established a basic test by which such speech is to be evaluated.  Our Circuit framed the test as follows:  "Restraints on the speech of government employees on matters of public concern are governed by a balancing test; they are permissible where the government interest in promoting the efficiency of the public services it performs through its employees outweighs the interests of prospective speakers and their audiences in free dissemination of the speakers views."  Weaver, 87 F.3d at 1439 (internal quotations and citations omitted).

### a.   Plaintiffs' Interest in the Exercise of Their First Amendment Rights

On one side of the Pickering balancing test, this Court must consider the Plaintiffs' well-established First Amendment rights. As noted above, and as Pickering emphasized, "[t]he public interest in having free and unhindered debate on matters of public importance" is a "core value of the Free Speech Clause of the First Amendment."  391 U.S. at 572.

Protection of First Amendment rights is particularly vital where the speech regards a matter of significant public importance. For some time now, especially since the terrorist attacks of September 11, 2001, the FBI has been under intense public scrutiny with respect to the effectiveness of its counter-terrorism efforts. Its critics are legion.  See, e.g., Bruce Berkowitz, The Big

15

Difference Between Intelligence and Evidence, Wash. Post, Feb. 2, 2002, at B1; Dana Priest & Dan Eggen, FBI Faulted on Al Qaeda Assessment, Domestic Threat was Underestimated, Panel Told, Wash. Post, Sept. 20, 2002, at A1; F.B.I. Chief Admits 9/11 Might Have Been Detectable, N.Y. Times, May 30, 2002, at A1 (quoting FBI Director at news conference in May 2002 as stating with respect to September 11: "But that doesn't mean there weren't red flags out there or dots that should have been connected."); see generally Joint Inquiry Into the Intell. Comm. Activities Before and After the Terrorist Attacks of Sept. 11, 2001, House Permanent Select Comm. on Intell. & Senate Select Comm. on Intell., H.R. Rep. No. 107-792, S. Rep. No. 107-351, at 62, 335, 337, 340 (2002) (referring several times to the intelligence community's failure to "connect the dots") (available at http://www.gpoaccess.gov/ serialset/creports/911.html); see also id., Add'l Views of the Members of the Joint Inquiry at 6, 33, 45, 67, 106.

This public debate is still very much alive, despite the passage of nearly five years. See, e.g. Lawrence Wright, A Reporter at Large: The Agent, The New Yorker, July 10 and 17, 2006 (outlining critical failures of communication between the CIA and the FBI prior to September 11, 2001).

Plaintiffs in this case sought to contribute their views and perspective to this public debate, but were denied permission by Defendants. FBI Special Agents like Plaintiffs, both of whom had

16

long careers with the FBI, are the kind of people who are likely to contribute the most illuminating insights to the public discourse about the Bureau and its performance in the counter-terrorism area. See Pickering, 391 U.S. at 571-72 (noting that teachers, as a class, are most likely to be able to provide "informed and definite opinions" on how funds allotted to schools should be spent – a matter of public concern for which the school administration's word should not be taken as conclusive).

The case for allowing Plaintiffs to be heard in this case is, if anything, far more compelling than in Pickering. Schools are, by their very nature, open institutions and, it is fair to say, that all parents (and many non-parents) have strong views about the teaching of their children and prioritizing of limited public funds. Moreover, there is no lack of informed public discussion in the media about educational policy. In contrast, the FBI, by its very nature, is not an open institution, and very few people are knowledgeable about its inner operations. For that very reason, the views of knowledgeable, informed, experienced "insiders" are of particular utility. Of course, it goes without saying that the subject matter itself – whether the FBI's efforts to counter and prevent terrorism attacks in this country have been successful – is of extraordinary public concern.

Moreover, Plaintiffs allege that the FBI was itself contributing its views to the public debate, while censoring

Plaintiffs from contributing theirs.  <u>See</u> Pl.'s Wright Mot. at 15 ("the FBI's real motive was to 'spin' the New York Times story [from the Miller interviews] in a favorable way to the agency . . .").  The FBI does not deny that during the time frame that Judith Miller interviewed Plaintiffs, she was permitted to interview Agency officials regarding the facts of the Vulgar Betrayal investigation.  Given this scenario, it is even more important that First Amendment freedoms are guaranteed in order to allow the dissemination of <u>competing</u> views in the public forum for debate and analysis.  <u>Sullivan</u>, 376 U.S. at 270 ("The First Amendment . . . 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection.'") (quoting <u>United States v. Assoc. Press</u>, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.)).

For all of these reasons, the interests favoring Plaintiffs' ability to publish their submissions carry great weight.

### b.  The Government's Interest in Promoting the Efficiency of Its Mission

On the other side of the <u>Pickering</u> balance, the Court must consider "the Government's ability to promote the efficiency of the public services it performs through its employees." <u>Pickering</u>, 391 U.S. at 568.  In this case, the Government argues that censorship of parts of Plaintiffs' submissions was necessary because they involve open investigations, grand jury proceedings, and sensitive law enforcement techniques.

18

There is no denying that the Government has a strong interest in "protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation" of its intelligence operations.  <u>Snepp</u>, 444 U.S. at 510, n.3.  Plaintiffs argue, however, that the Government's interest is significantly reduced, if not entirely eliminated, when the information at issue is already in the public domain and, therefore, the Government's operations cannot be affected adversely.  Here, Plaintiffs contend that all of the censored portions of their submissions were already in the public domain, and therefore none should be censored.[14]  <u>See</u> Pl.'s Wright Mot. at 2.

There is no case, from the Supreme Court or our Circuit, nor has the Government cited any, holding that information in the public domain may be censored.  Indeed, in <u>McGehee</u>, the D.C. Circuit specifically noted that "when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated."  718 F.2d at 1141.  The Circuit relied heavily on <u>United States v. Marchetti</u>, which held that the government may not censor information obtained from public sources, "contractually or

_____

[14]   It should be noted that the secrecy agreement Plaintiffs signed upon joining the FBI, requiring prepublication review, does not "apply to information which has been placed in the public domain" Defs.' Vincent Mot., Ex. 3; nor does the Government make any argument that it does.

otherwise." 466 F.2d 1309, 1313 (4ᵗʰ Cir. 1972). <u>See also</u> <u>Snepp</u>, 444 U.S. at 513 n.8 (dictum) ("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned").

Finally, in the most recent case from our Court of Appeals dealing with these issues, <u>Weaver</u>, the Court observed that "it is doubtful that the agency could, consistent with <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968), penalize publications devoid of non-public information, by employees with non-sensitive responsibilities (e.g., a driver, a payroll accountant), writing in a context where their statements could not possibly be viewed as representing the agency or the United States, simply because the publication took a view inconsistent with current foreign policy." 87 F.3d at 1436 (internal citation omitted).

Wright claims he submitted "copious documentation in support of his submissions" to the FBI, which he alleges "provide[s] a publicly available source of information for each fact contained in SA Wright's submissions relating to terrorism." Pl.'s Wright Mot. at 17. For example, Wright alleges that Chapter 26 of his manuscript, which he was not allowed to publish, was "based entirely on newspaper accounts and discusses well known cases . . . ." <u>Id.</u> Wright attests to this in his Declaration, but does not provide the actual documentation to support his claim, which he did

submit to the FBI after it had conducted its first review of his Fatal Betrayals manuscript.

Defendants' only argument in response is that Wright's submissions "were reviewed by the USAO-N.D.Ill., and that office determined that many of them post date [his] submissions, indicating that his original base of knowledge was not public source information, but rather was obtained by virtue of his position with the FBI and, more specifically, because of his knowledge of grand jury proceedings." Def.'s Wright Reply at 9; see also Bolthouse Decl. (Wright) at ¶ 21.

Defendants' argument, even if accurate, does not explain how, regardless of how or when Wright learned of certain information, the Government could have any interest whatsoever in censoring it if it is already in the public domain.

With respect to the Miller interview questions and answers, both Plaintiffs argue that Miller's questions essentially asked them to confirm or deny statements of fact that the FBI officials had already given to her.

Again, although the Government contests that the information it censored was in the public domain, it provides little support for its argument. In Vincent's case the Government submitted a summary of the FBI officials' interview with Miller as an interrogatory response. See Defs.' Vincent Mot., Ex. 21. This summary, however, does not adequately show how the information

Vincent sought to publish went beyond what the FBI officials had divulged to Miller, or how it was otherwise not within the public domain.

In short, there are genuine issues of material fact in dispute.  The record is by no means clear enough for the Court to establish whether the censored portions of Plaintiffs' submissions were in the public domain.  Moreover, since the Government did not follow its own internal policy pursuant to the MAOP, Section 1-24 (4)(a)(3)(d), requiring that it identify by line and page number the reasons for its objections, there is no basis for determining whether the censored submissions were in the public domain.  Defs.' Vincent Mot., Ex. 18.  Without such information, the Court cannot weigh the Government's interest in maintaining the secrecy of the information it censored.  Therefore, Defendants will be required to submit detailed affidavits explaining which portions of the censored submissions were not in the public domain, and Plaintiffs will be given an opportunity to respond.

### c.  Whether Non-Classified Information May Be Censored

Plaintiffs also argue that the Government is not allowed to censor information that is not classified, as Defendants concede is the case for all of Plaintiffs' submissions.  There is some case law supporting this general principle.  See McGehee, 718 F.3d at 1141 ("The government has no legitimate interest in censoring unclassified materials."); Snepp, 444 U.S. at 513 n.8 (dictum) ("if

22

in fact the information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned").

However, Plaintiffs' secrecy agreement does not limit the scope of the Government's censorship to classified information. Moreover, the Government may still have a legitimate interest in censoring unclassified information. The mere fact that information is not classified does not mean that it is not 'secret' in the lay sense of the word. For example, during oral argument on these Motions, the Government's counsel noted that lists of undercover agents may not be classified, but dissemination of such information would nonetheless seriously impair the Government's counter-terrorism efforts and national security interests.

This Court's task, under <u>Pickering</u>, is to balance the competing interests of the parties. Only after determining which portions of Plaintiffs' censored submissions were in the public domain, will the Court be able to consider all of the Government's arguments for censoring Plaintiffs' submissions against the exceedingly strong interest Plaintiffs have in publishing that information.

### B.   Defendants' Motions Are Granted as to Plaintiffs' Claims Under 28 CFR § 17.18

Plaintiffs allege in Count II of their Complaints that Defendants violated 28 C.F.R. § 17.18, a regulation relating to the DOJ's prepublication review process for classified information. Part 17 of Title 28 of the Code of Federal Regulations is titled

"Classified National Security Information and Access to Classified Information."  The purpose of the section is "to ensure that information relating to the national security is classified, protected, and declassified pursuant to the provisions of Executive Orders 12958 and 12968 and implementing directives from the Information Security Oversight Office of the National Archives and Records Administration."  29 C.F.R. § 17.1.  Therefore, the prepublication review provision contained in Part 17 (section 17.18) applies only to review of classified information.

Since it is undisputed that none of Plaintiffs' submissions contain classified information, this regulation does not apply to Plaintiffs' submissions.  Accordingly, Defendants' Motions must be **granted** as to Plaintiffs' claims under 28 CFR § 17.18.

### C.  Defendants' Motions Are Granted as to Plaintiffs' APA Claims

In Count III of their Complaints, Plaintiffs argue that Defendants' final decisions censoring their submissions from publication were arbitrary and capricious, in violation of the APA.

When reviewing actions by an administrative agency, courts are bound by the highly deferential standard embodied by the APA.  5 U.S.C. § 706(2)(A).  Under this standard an agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id.  If the "agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality,'" the decision "is reasonable and

24

must be upheld." Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 520-21 (D.C. Cir. 1983) (citation omitted).

Plaintiffs first allege an APA violation based on Defendants' failure to follow "their own procedures," by "failing to specify any particular portions of the answers that allegedly are objectionable to allow Plaintiff to revise the answers to address Defendants' alleged concerns." Wright Second Am. Compl. at ¶ 44.

Defendants argue, and Plaintiffs do not dispute, that these procedures are internal agency guidelines. The law is well-settled that internal guidelines can not create a cause of action in federal court. To be given the force and effect of law, a regulation must prescribe "substantive" or "legislative" rules rather than merely "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." Chrysler Corp. v. Brown, 441 U.S. 281, 301 (1979) (internal citation omitted). Moreover, the regulation must be promulgated pursuant to a statutory grant of authority and "must conform with any procedural requirements imposed by Congress," id. at 302-03, characteristics which are not present in this case.

Internal guidelines, such as those at issue in this case, do not create an actionable duty for an agency. United States v. Am. Prod. Indus., Inc., 58 F.3d 404, 407 (9th Cir. 1995); Akin v. Office of Thrift Supervision, 950 F.2d 1180, 1186 n.7 (5th Cir. 1992); United States v. Craveiro, 907 F.2d 260, 264 (1st Cir. 1990).

Accordingly, the fact that Defendants did not follow their internal guidelines in this case, although not desirable, does not, in and of itself, amount to a violation of the APA. Schweiker v. Hansen, 450 U.S. 785, 789 (1981) (holding that claims processing manual was for internal agency use, and did not carry the force of law or bind the agency); Prudential-Maryland Joint Venture Co. v. Lehman, 590 F. Supp. 1390, 1403 (D.D.C. 1994) (Department of Defense directives and instructions regarding procurements were for internal guidance and did not have the force and effect of law).

Second, Plaintiffs argue that Defendants' change of position regarding their submissions demonstrates arbitrary and capricious behavior. Defendants openly concede that they made mistakes handling Plaintiffs' submissions. "The FBI does admit (as it must) that the agency's initial decision denying plaintiff permission to publish any of his responses was not the proper determination." The FBI further admits that it erred in failing to consult the USAO N.D.Ill. sooner. "The FBI acknowledges, as it must, that such consultation should have taken place when SA Wright first submitted his manuscript and other materials, rather than after he submitted his revisions in January/February 2002." Def.'s Wright Reply at 5.

However, none of these procedural mistakes demonstrate that the substance of Defendants' final decision was arbitrary and capricious. Defendants' final position was reached after obtaining additional crucial information, of which they were not previously

aware, from other agencies and entities.   As opposed to being arbitrary and capricious, Defendants' changes in position were in line with the recommendations they received from those other agencies and entities.

Finally, Plaintiffs point to the fact that Defendants' final decisions were not reached until years after they first submitted their materials for prepublication review.   Plaintiffs' argument highlights the problems that arise from an agency deciding not to follow its guidelines and procedures for handling prepublication review requests.   As Defendant's concede, had they handled Plaintiffs' request differently, the time for total review would most probably have been much shorter.

However, the prepublication review policy itself does not set out a strict deadline by which a final decision much be made, and the D.C. Circuit has declined to hold that such a deadline is required.   Weaver, 87 F.3d at 1443 ("[W]e reject the idea that prior review in the employment context must proceed under a pre-set time limit.").   Therefore, while the Court is sympathetic to Plaintiffs' position, the time lag does not amount to a violation of the law.

Because Defendants' course of action conformed to "certain minimal standards of rationality," the Court does not conclude that the Government's actions were arbitrary and capricious and in violation of the APA.   Small Refiner Lead Phase-Down Task Force v.

27

<u>EPA</u>, 705 F.2d 506, 521 (D.C. Cir. 1983) (internal citation and quotation omitted).   Accordingly, Defendants' Motions must be **granted** as to Plaintiffs' APA claims.

## IV.   CONCLUSION

For the reasons stated herein, the parties' Motions for Summary Judgment are **denied** with respect to Plaintiffs' First Amendment Claims, and Defendants' Motions are **granted** with respect to Plaintiffs' claims under 28 C.F.R. § 17.18 and the APA.

An Order will issue with this Memorandum Opinion.


                                        /s/_____
July 31, 2006                           Gladys Kessler
                                        United States District Judge

**Copies to: Attorneys of Record via ECF**